## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
RONDA C.,                        )
                                 )
              Plaintiff,         )
                                 )
       v.                        )        1:24CV493
                                 )
FRANK J. BISIGNANO,              )
Commissioner of Social           )
Security,                        )
                                 )
              Defendant.[1]      )
```

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Ronda C., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 10 (Plaintiff's Brief); Docket Entry 11 (Commissioner's Brief); Docket

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute for Leland C. Dudek as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Entry 12 (Plaintiff's Reply)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 224-37), alleging a disability onset date of September 1, 2021 (see Tr. 224, 227, 231). Upon denial of those applications initially (Tr. 88-109, 130-39) and on reconsideration (Tr. 110-29, 147-52), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 153-54).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 42-87.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 11-35.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 222-23, 341), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1.   [Plaintiff] meets the insured status requirements of the . . . Act through March 31, 2026.
>
> 2.   [Plaintiff] has not engaged in substantial gainful activity since September 1, 2021, the alleged onset date.

---

[2] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 8 at 1.)

2

3.     [Plaintiff] has the following severe impairments: obesity, recurrent small bowel obstruction with chronic constipation, brain meningioma, headache, degenerative disc disease of the lumbar spine, trigeminal neuralgia, depressive disorder, and anxiety.

. . .

4.     [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.     . . . [Plaintiff] has the residual functional capacity to perform light work . . . with exceptions. She can lift/carry 20 pounds occasionally and 10 pounds frequently, can stand/walk for six hours in an eight-hour workday, and can sit for six hours in an eight-hour workday. [She] can frequently climb ramps and stairs, but can only occasionally climb stepladders up to four vertical feet in height, and she can never climb higher ladders or ropes/scaffolds of any height.  She can frequently kneel and crouch, but is limited to occasional stooping and crawling.  [She] can tolerate occasional exposure to extreme cold and heat and to vibration and high, exposed places.  She is limited to performing work that is frequently performed indoors and she must be afforded the ability to wear tinted lenses as needed when performing assigned work.  [She] can tolerate exposure up to and including moderate noise.  She is limited to work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, and for which little specific vocational preparation and judgment are needed.  [She] is limited to work that is not frequently performed on an assembly line or at a similar production pace.  She can have occasional interactions with supervisors, coworkers, and the public when performed [sic] the assigned work.  [She] requires access to indoor toilet facilities during routine employer-provided breaks.  Due to effects of [her] combination of impairments, she would be absent, tardy, or require early departure from work approximately four to five times per year.

. . .

3

6.    [Plaintiff] is capable of performing past relevant work as a cleaner housekeeper ([Dictionary of Occupational Titles ('DOT')] number 323.687-014; light; unskilled; svp-2).    This work does not require the performance of work-related activities precluded by [Plaintiff]'s residual functional capacity.

. . .

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that [Plaintiff] can perform, considering [her] age, education, work experience, and residual functional capacity.

. . .

7.    [Plaintiff] has not been under a disability, as defined in the . . . Act, from September 1, 2021, through the date of th[e ALJ's] decision.

(Tr. 16-29 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."    Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).    However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).    Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).    Instead, "a reviewing court must uphold the factual findings of the ALJ

4

[underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the

5

claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment,

_____

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ failed to adequately account for the number of absences Plaintiff would incur due to her hospitalizations and treatments for [small bowel obstructions ('SBOs')] and headaches with trigeminal neuralgia in the RFC assessment" (Docket Entry 10 at 5 (bold font and block formatting omitted); see also Docket Entry 12 at 1-3); and

2) "[t]he ALJ erred by failing to make appropriate findings concerning the frequency and duration of Plaintiff's need for breaks to use the bathroom due to bowel urgency in the RFC" (Docket Entry 10 at 14 (bold font and block formatting omitted); see also Docket Entry 12 at 3-7).

The Commissioner contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 11 at 6-24.)

### 1. Absenteeism Due to SBOs and Headaches

In Plaintiff's first issue on review, she maintains that "[t]he ALJ failed to adequately account for the number of absences Plaintiff would incur due to her hospitalizations and treatments for SBOs and headaches with trigeminal neuralgia in the RFC assessment." (Docket Entry 10 at 5 (bold font and block formatting omitted); see also Docket Entry 12 at 1-3.) More specifically, Plaintiff contends that, "[a]s the [United States Court of Appeals

9

for] the Fourth Circuit and this [C]ourt have explained, absences incurred due to illness as well as absences for the treatment of the illnesses themselves can prevent work if they are occurring so frequently that the individual cannot maintain necessary attendance for employment[.]"  (Docket Entry 10 at 5; see also id. at 6-7 (citing, inter alia, Dennis v. Kijakazi, No. 21-2078, 2023 WL 2945903, at *5-6 (4th Cir. Apr. 14, 2023) (unpublished), Meyer v. Astrue, 662 F.3d 700, 707 n.3 (4th Cir. 2011), and Shoemaker v. Saul, No. 1:19CV441, 2020 WL 5117992, at *5-6 (M.D.N.C. Aug. 31, 2020) (unpublished) (Peake, M.J.), recommendation adopted, slip op. (M.D.N.C. Sept. 15, 2020) (Schroeder, C.J.)).)  Plaintiff points out that "the ALJ found that[,] '[d]ue to effects of [Plaintiff]'s combination of impairments, she would be absent, tardy, or require early departure from work approximately four to five times per year'" (id. at 7 (quoting Tr. 20)), but that, "[a]t no point in his decision, . . . does the ALJ explain how he arrived at that number of absences" (id.).

In Plaintiff's view, "the record shows that between 2021 and 2023, [Plaintiff] was in the hospital or at her specialist's office for other treatments well over the four to five days per year which the ALJ found would account for her absences in his RFC assessment" (id. at 7 (citing Tr. 20)) and, "in the one-year period between May of 2022 and May of 2023 (when the hearing was held), [Plaintiff] was in the hospital more than 20 days during separate hospitalizations to treat her SBOs" (id. at 7-8).  Plaintiff

10

further notes that "[the 20-day] figure does not even include the number of days she spends at home recuperating *after* each hospitalization (she testified to recuperation for about one week after (*see* [Tr.] 69-70)), and it does not include the absences that she would incur due to her experience of trigeminal neuralgia attacks (*see* [Tr.] 64-65)[,] the frequency of which has varied throughout the relevant time period from multiple times per week to a few times per year." (Docket Entry 10 at 8 (italics supplied by Plaintiff) (final internal parenthetical citation omitted)). Plaintiff additionally notes that "the VE in this case testified that[,] if [Plaintiff] were to miss more than one day of work per month[, ] she would not be competitively employable" (id. at 7 (citing Tr. 83)), and thus argues that, "if not reversed for an award of benefits pursuant to the VE's testimony regarding the work prohibitive effect of [Plaintiff]'s excessive absences . . ., then this case must be remanded so that the ALJ can properly analyze the records and provide an explanation for how he calculates the number of absences [Plaintiff] would incur in the RFC assessment" (id. at 13). For the reasons explained in more detail below, Plaintiff's contentions ultimately lack merit.

RFC entails assessment of a claimant's ability to do sustained work-related physical and mental activities in a work setting "on a regular and continuing basis," 20 C.F.R. §§ 404.1545(b), (c), 416.945(b), (c) (emphasis added), which "'means 8 hours a day, for

5 days a week, or an equivalent work schedule,'" <u>Hines</u>, 453 F.3d at 562 (emphasis omitted) (quoting Social Security Ruling 96-8p, <u>Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL 374184, at *2 (July 2, 1996) ("SSR 96-8p")).  In making the RFC determination, the ALJ must take into consideration "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)."  SSR 96-8p, 1996 WL 374184, at *5.  Moreover, "[a]bsenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." <u>Griffin v. Commissioner of Soc. Sec.</u>, No. 2:15CV13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017) (unpublished).  Here, for the reasons that follow, Plaintiff has ultimately failed to demonstrate that the record evidence regarding her recurrent SBOs and headaches should have compelled the ALJ to include <u>work-preclusive</u> levels of absenteeism in the RFC.

The ALJ analyzed the evidence relating to Plaintiff's hospitalizations for SBOs and treatment for headaches as follows:

> The [ALJ] finds the medical record concerning the effects of [Plaintiff]'s . . . recurrent [SBO] with chronic constipation, . . . headache, . . . [and] trigeminal neuralgia . . . do not show these impairments to be as functionally limiting as has been alleged . . . .
>
> At the initial level, [the state agency medical consultant] noted hospitalization in early <u>January 2021</u>

secondary to [SBO]. Additional hospital presentations/admissions for abdominal pain/[SBO] were noted in <u>May and June 2021</u> and in <u>January 2022</u>. . . . [Plaintiff] was also reporting <u>daily</u> headaches located in the left posterior superior region during follow-up in mid-October 2021. She was seen in December 202[1] for follow-up of headaches. . . . She was hospitalized in <u>January 2022</u> for [SBO], and providers also noted diagnos[i]s of . . . trigeminal neuralgia. . . .

At reconsideration, [the state agency medical consultant] noted follow-up in March 2022 with concern about trigeminal neuralgia. Follow-up in April 2022 for headache indicates reported headache frequency of <u>four to five timer per week</u> as well as some hypesthesia as described. . . . Follow-up in May also noted [Plaintiff] reporting headaches that had reduced in frequency such that they occurred <u>approximately every three to four months</u> and that she had <u>good results with Neurontin</u>. In <u>July 2022</u>, [Plaintiff] was seen in the emergency department with left upper and lower quadrant pain radiating to the back, with CT [scan] noting probable early partial [SBO]. . . .

Turning to the new evidence, additional hospitalizations for [SBO] took place in <u>September 2022</u> and in <u>February/March 2023</u>. This is <u>in addition to the prior hospitalizations noted by [the state agency medical consultants] during 2021 and early 2022</u>. As noted by [those consultants], treatment has typically been nonsurgical, consisting of nasogastric (NG) tube placement and medication with resolution of symptoms.

The record reflects additional primary care follow-ups during the relevant period; however, <u>the vast majority appear related to weight loss or routine follow ups, with relatively few visits relating to acute illness</u>. . . .

For example, notes from an office visit on April 19, 2022, include that [Plaintiff] presented for a routine weight loss follow up. <u>Examination was unremarkable</u> beyond noting obesity . . . . <u>Counseling regarded increased physical activity was provided, which suggests that negative symptomology and limiting effects associated with [Plaintiff]'s impairments may not be as limiting as were alleged</u> . . . .

13

At a routine check up on August 17, 2022, [Plaintiff] had no complaints across any system. Examination was entirely normal beyond noting obesity.

Regarding [Plaintiff]'s headaches, treatment notes indicate variability with the reported frequency of [Plaintiff]'s symptoms. For example, . . . [Plaintiff] has reported daily headaches, but has also reported only occasional headaches, in September 2021 reporting only three headaches over the last year. In December 2021, she reported that her headaches came on fast and would end fast . . . . [Plaintiff] was noted to be responsive to [g]abapentin/Neurontin, with the provider concluding that [Plaintiff's] symptoms were likely related to trigeminal neuralgia with a partial response to [g]abapentin. Notes from a neurology follow-up in March 2022 include [Plaintiff]'s reports that she was generally doing okay on high-dose [g]abapentin. She did report a recent flare-up, although it was characterized as not being "full blast." She was diagnosed with trigeminal neuralgia and continued on [g]abapentin. At a follow-up in April 2022, [Plaintiff] reported four to five headaches per week of moderate severity. At that time, the provider apparently felt that there was a component of trigeminal neuralgia that may be causing [Plaintiff]'s symptoms, noting that [she] had improved on [g]abapentin and was no longer experiencing stabbing pain with tactile feedback on the face. During follow-up in June 2022, neurology found that [Plaintiff] was neurologically stable and recommended follow-up in three to four months. Thereafter, reports of symptoms were variable regarding reported headache, with some appointment notes indicating no complaints of headache, while others reflect complaints of headache. During mental health follow-up in April 2023 [Plaintiff] reported intermittent headache, which was not otherwise quantified. . . .

(Tr. 22-23 (emphasis added) (internal parenthetical citations omitted).)

The ALJ thereafter explained how he accounted for Plaintiff's recurrent SBOs and headaches in the RFC in the following manner:

Considering the record as a whole, the medium exertion limitation [the state agency medical consultants] placed overstates [Plaintiff]'s actual exertional capacity. Specifically, there is a history of recurrent [SBO] with

14

abdominal pain. There is also a history of headaches that were/are possibly associated with trigeminal neuralgia. . . . Considering these factors and the totality of [Plaintiff]'s impairments and associated limitations, a limitation to work at the light exertional level is therefore more appropriate. Beyond that, a variety of postural, environmental, and nonexertional limitations are also included . . . . I have also considered the effects of pain associated with [Plaintiff]'s physical impairments . . . . A limitation to moderate noise is provided due to headaches . . . . An allowance for absenteeism on an annualized basis is also placed due to the combined effects of her physical and mental impairments, to include history of hospitalizations associated with [SBO].

The above-referenced exam findings, high functioning activities of daily living that include raising a child, going out alone, driving a car, and shopping in stores and by computer, and statements at medical visits regarding medication/treatment efficacy are inconsistent with [Plaintiff]'s testimony and statements that she cannot work due to disabling . . . recurrent [SBO] with chronic constipation, . . . headache, . . . [and] trigeminal neuralgia . . . .

(Tr. 25 (emphasis added) (internal parenthetical citations omitted).)

As an initial matter, the ALJ's 1) express discussion of all of Plaintiff's hospitalizations for SBOs in the record (see Tr. 22-24), as well as detailed discussion of Plaintiff's headache treatment (see Tr. 23), and 2) inclusion of specific limitations in the RFC, i.e., absence and noise allowances, to account for Plaintiff's SBOs and headaches (see Tr. 20), distinguish this case from Dennis, Meyer, and Shoemaker. In each of those cases, the ALJ failed to discuss the impact of the plaintiff's impairments on work absence or to include any allowance for absence in the RFC.

15

The Fourth Circuit in <u>Dennis</u> emphasized the importance of those facts to its decision to remand:

> [T]he ALJ's failure to discuss the record evidence regarding [the plaintiff's] absenteeism results in [the court's] inability to provide meaningful review. There is evidence supporting [the plaintiff's] need to miss work in the administrative record, and the ALJ's decision does not discuss this evidence, nor does the ALJ's decision adequately explain why the evidence should be rejected. Indeed, the ALJ did not offer any reasons for rejecting or discounting the frequency of [the plaintiff's] medical treatment. Nowhere in the denial did the ALJ address: (1) the frequency of [the plaintiff's] medical treatment, (2) how the frequency of [the plaintiff's] medical treatment would impact absenteeism, or (3) how [the plaintiff's] frequent medical treatment would impact the VE's testimony that missing more than 7 to 10 days per year would be subject to firing. This was error because [the court] can only guess why the ALJ failed to address the obvious implications of [the plaintiff's] frequent medical treatment.

<u>Dennis</u>, 2023 WL 2945903, at *5 (emphasis added) (internal quotation marks and parenthetical citation omitted).

Similarly, in <u>Meyer</u>, the Fourth Circuit stressed the significance of the ALJ's failure to make findings regarding the impact of recurrent treatment on work absence:

> [The court] note[s] that the record indicates that [the plaintiff] attended more than 170 physical therapy sessions after his surgery through June 2006. Following the lead of the Fifth Circuit in *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000), a case the Commissioner concedes supports [the plaintiff], [the court] further instruct[s] the Commissioner on remand to "consider the effect of [this] ongoing treatment on [the plaintiff's] ability to remain gainfully employed during the period of claimed disability." The Commissioner should also consider whether such evaluation requires [VE] testimony to prove [the plaintiff] retains the ability to perform

16

specific jobs which exist in the national economy. <u>The</u>
<u>ALJ made no findings with respect to these issues</u>.

<u>Meyer</u>, 662 F.3d at 707 n.3 (emphasis added) (internal citations and
quotation marks omitted).

Another judge of this Court also remanded where an ALJ simply
failed to address how the plaintiff's recurring infusions would
impact her absenteeism:

> [I]n assessing [the p]laintiff's RFC, <u>the ALJ did not</u>
> <u>consider effects of treatment</u>, including limitations or
> restrictions imposed by the mechanics of treatment
> related to [the p]laintiff's bi-weekly infusions . . .,
> and did not obtain evidence from the [VE] regarding the
> availability of employment in light of those limitations.
> Given <u>the ALJ's failure to address or consider this issue</u>
> <u>at all</u>, substantial evidence fails to support the ALJ's
> decision, and remand is required to allow the ALJ to
> consider the effect of [the p]laintiff's treatment on her
> ability to work.

<u>Shoemaker</u>, 2020 WL 5117992, at *6 (emphasis added) (internal
quotation marks omitted). Given that the ALJ here expressly
discussed Plaintiff's treatment for headaches, as well as all of
her hospitalizations for SBOs (<u>see</u> Tr. 22-24), and included
specific limitations in the RFC to account for those impairments
(<u>see</u> Tr. 20, 25), <u>Dennis</u>, <u>Meyer</u>, and <u>Shoemaker</u> thus do not aid
Plaintiff's cause in arguing for remand here.

On the other hand, as Plaintiff argues (<u>see</u> Docket Entry 10 at
7), the ALJ did not adequately explain how he arrived at the figure
of "<u>four to five [absences] per year</u>" (Tr. 20 (emphasis added)).
The record reflects that, during the approximately <u>26-month</u>
relevant period from Plaintiff's alleged onset date of September 1,

17

2021, to the ALJ's decision on October 27, 2023,[7] Plaintiff spent a total of 20 days in hospital for recurrent SBOs (see Tr. 1040-70 (1/9-1/11/22 3 days), 1481-84 (7/31/22 1 day), 1647-71 (9/8-9/12/22 5 days), 1689-92 (2/11/23 1 day), 1699-1733 (2/26-3/2/23 5 days), 1750-79 (3/7-3/10/23 4 days), 2058-62 (5/17/23 1 day)), which reflects an average of approximately nine days per year.[8]   In light of that undisputed record evidence, the ALJ failed to support with substantial evidence his finding that Plaintiff's combined impairments would cause her to sustain four to five absences a year (see Tr. 20).

The ALJ's error in that regard, however, qualifies as harmless under the circumstances presented here.  See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason

---

[7] During the hearing, the ALJ agreed to hold the record open for 30 days to allow Plaintiff to submit additional evidence.  (See Tr. 49.)  Plaintiff requested two more extensions of time (see Tr. 336, 338), and then confirmed the record's completion on July 12, 2023 (see Tr. 339).  The last medical record Plaintiff submitted to the ALJ documented Plaintiff's surgical lysis of intestinal adhesions on May 17, 2023.  (See Tr. 2058-66.)  Plaintiff neither submitted additional evidence to the Appeals Council (see Tr. 1-6, 222-23, 341), nor to this Court (see Docket Entries 10, 12).  Thus, the record does not contain any further evidence of hospitalization for SBOs through October 27, 2023, the date of the ALJ's decision.

[8] Expanding to the 45-month period covered by the entire record from the oldest treatment visit in the record dated January 27, 2020 (see Tr. 361-70), to the ALJ's decision on October 27, 2023, Plaintiff accumulated 28 days in hospital related to her recurrent SBOs (see Tr. 564-75 (6/28-6/30/21 3 days), 580-89 (5/31-6/1/21 2 days), 598-617 (1/1-1/3/21 3 days), 1040-70 (1/9-1/11/22 3 days), 1481-84 (7/31/22 1 day), 1647-71 (9/8-9/12/22 5 days), 1689-92 (2/11/23 1 day), 1699-1733 (2/26-3/2/23 5 days), 1750-79 (3/7-3/10/23 4 days), 2058-62 (5/17/23 1 day)), which translates to an average of approximately seven and a half days per year.

to believe that the remand might lead to a different result"). As discussed above, the record demonstrates, at most, absenteeism due to SBO hospitalizations at a rate of nine days per year - a level of absenteeism below the VE's opinion that more than 12 absences per year qualify as work preclusive (see Tr. 83). See Joseph D. W. v. O'Malley, No. 1:23CV863, 2024 WL 3822724, at *7-8 (M.D.N.C. Aug. 14, 2024) (unpublished) (holding that "hospitalizations [for SBOs] totaling 19 days in the 29 months between [the plaintiff's] onset date and the ALJ's decision," which amounted to an average of eight absences per year, "simply d[id] not establish that [the p]laintiff's gastrointestinal impairments would have caused him to miss work more than one day per month on an ongoing basis throughout the relevant period" (footnote omitted)); compare Brown v. Berryhill, No. 1:17CV1096, 2018 WL 3910833, at *4 (M.D.N.C. Aug. 15, 2018) (unpublished) (Webster, M.J.) (faulting ALJ for "characteriz[ing] the p]laintiff's pain and limitation from pancreatitis as not ongoing," where, "by the Court's count, [the p]laintiff was hospitalized eleven times and for a total of fifty-four days between the alleged amended onset date and the decision date[ and] visited the emergency room at least nine other times . . ., or on average two days each month." (emphasis added)),

19

recommendation adopted, 2018 WL 5447699 (M.D.N.C. Sept. 5, 2018) (unpublished) (Eagles, J.).[9]

Plaintiff additionally maintains that she would incur absences "due to her experience of trigeminal neuralgia attacks[,] the frequency of which has varied throughout the relevant time period from multiple times per week to a few times per year." (Docket

_____

[9] Although Plaintiff contends that, "between May of 2022 and May of 2023 . . ., [she] was in the hospital for more than 20 days during separate hospitalizations to treat her SBOs" (id. at 7-8 (emphasis added)), Plaintiff did not provide a specific citation to the record to support that assertion, beyond a generic citation to "[s]ee infra" (id. at 8). The record confirms that Plaintiff spent 16 days in hospital from May 1, 2022, to May 1, 2023 (see Tr. 1481-84 (7/31/22 1 day), 1647-71 (9/8-9/12/22 5 days), 1689-92 (2/11/23 1 day), 1699-1733 (2/26-3/2/23 5 days), 1750-79 (3/7-3/10/23 4 days)), but 10 of those days occurred in a one-month period from February 11 to March 10, 2023, when Plaintiff experienced an acute exacerbation of her recurrent SBOs. Shortly thereafter, on May 17, 2023, Plaintiff underwent lysis of adhesions (which Plaintiff had previously deferred (see Tr. 1067)) to address her recurrent SBOs. (See Tr. 2058-66.) The record fails to reveal any other one-month period with that degree of hospitalization, and thus Plaintiff has not shown that her recurrent SBOs caused her to experience impermissible levels of absence on a consistent, ongoing basis during the relevant period. See Blackmon v. Commissioner of Soc. Sec., No. 23-12894, 2024 WL 3495022, at *7 (11th Cir. July 22, 2024) (unpublished) ("The ALJ's decision not to include absenteeism limitations in [the plaintiff]'s RFC is supported by substantial evidence. . . . Looking to the time period between . . . [the plaintiff]'s amended onset date[] and . . . [the plaintiff]'s last documented medical event . . ., [the plaintiff] had medical events on only eight days, for an average of just over 1 time per 30 days. And [the plaintiff] had multiple medical events in just one of the months between her amended onset date and her [ALJ hearing], which is hardly having multiple medical events in a month on a regular and ongoing basis." (emphasis added) (internal quotation marks omitted)). Plaintiff further suggests that the calculation of absences should "include the number of days she spen[t] at home recuperating after each hospitalization" (Docket Entry 10 at 8 (italics supplied by Plaintiff)), and notes her testimony that she "recuperat[ed] for about one week after" each hospitalization (id. (citing Tr. 69-70)). However, when Plaintiff's attorney asked "[h]ow long [] it t[ook for Plaintiff] to recover" after an SBO hospitalization (Tr. 69), Plaintiff testified that:

> [a]fter the [nasogastric] tube, it - I would say about a week, a week to get just like - because I know a lot of things that they give me to. And then like after then, I just try to eat slowly, try to eat soft things like that, like dark jelly, light food. And then I just try to deal with all this stuff.

(Tr. 69-70.) Notably, that testimony did not describe disabling symptoms (much less symptoms that would necessitate work absence) during the days following her SBO hospitalizations.

Entry 10 at 8 (citing Tr. 64-65) (internal parenthetical citation omitted).) In support of that argument, Plaintiff describes evidence in the record she believes demonstrates that her trigeminal neuralgia and/or headaches would have caused her to incur work absences during the relevant period. (See id. at 9-12 (citing Tr. 547-56, 874-77, 1280-82, 1294-95, 1453-54, 1491-94, 1641-43).)

Contrary to Plaintiff's arguments, the records cited by Plaintiff do not demonstrate that her trigeminal neuralgia and/or headaches would have resulted in work absence. Those records do not contain any emergency visits, hospitalizations, or surgeries but, rather, reflect routine follow-up visits and improvement in symptoms on conservative treatment with gabapentin and pregabalin. (See Tr. 547-56, 874-77, 1280-82, 1294-95, 1453-54, 1491-94, 1641-43).[10] Moreover, as the ALJ recognized (see Tr. 23 (noting that "treatment notes indicate variability with the reported frequency of [Plaintiff]'s symptoms," in that "[Plaintiff] has reported daily headaches, but has also reported only occasional headaches, [and] in September 2021[, she] report[ed] only three headaches over the last year" (emphasis added))), Plaintiff reported widely divergent and, at times, conflicting, frequencies of her trigeminal neuralgia attacks/headaches (see Tr. 65 (at hearing on 5/16/23,

---

[10] Three of those visits primarily concerned investigation of a benign meningioma discovered incidentally on a CT scan that Plaintiff's providers did not cite as a cause of her trigeminal neuralgia/headaches. (See Tr. 546-57, 1491-94.)

characterizing headaches as "not too intense to manage" and as not "happening very frequently"), 551 (reporting, on 9/21/21, "occasional" headaches, that Plaintiff "can go months without having [one]," that "[t]hey l[a]st approximately 30 minutes if she stops and rests," and that, "[o]ver the last year she has only had [three] headaches"), 547 (23 days later on 10/14/21, inexplicably describing headaches as "daily"), 874-77 (on 12/7/21, deeming headaches "remarkable for how fast they come on, and how fast they go away"), 1294-95 (on 3/17/22, complaining of "flareup the other day 'but it wasn't full blast'"), 1490-94 (on 4/28/22, inexplicably now claiming "moderate to severe headaches" occurring "[four] to [five] times a week . . . for at least 12 years"), 1453-54 (14 days later on 5/12/22, alleging pain from trigeminal neuralgia "every [three to four] months" with "good results" on gabapentin), 1641-43 (on 11/10/22, recounting "[four] episodes of severe sharp pain on her face" since June 2022). The ALJ (and not this Court) must resolve such conflicts in the evidence, see Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."), and thus the Court will not disturb the ALJ's decision that Plaintiff's trigeminal neuralgia and headaches, although severe impairments (see Tr. 17), did not cause, either singly or in combination with her SBOs, a work-preclusive level of absence (see Tr. 20, 25).

In light of the foregoing analysis, Plaintiff's first assignment of error fails as a matter of law.

## 2. Frequency and Duration of Restroom Breaks

Lastly, Plaintiff contends that "[t]he ALJ erred by failing to make appropriate findings concerning the frequency and duration of Plaintiff's need for breaks to use the bathroom due to bowel urgency in the RFC." (Docket Entry 10 at 14 (bold font and block formatting omitted); see also Docket Entry 12 at 3-7.) In particular, Plaintiff points to her "testi[mony] that she is on a special diet for her intestinal problems and takes medication to try and keep things moving[, that] when not experiencing an obstruction, these medications cause her to use the restroom frequently for bowel movements, at least five times per day" (Docket Entry 10 at 14 (citing Tr. 66)), that "[s]he also continues to experience cramping and nausea while not in the hospital" (id. (citing Tr. 69)), and "that she wears protective pads '24/7' because her bowel movements are urgent and sometimes, she does not get to the bathroom in time and has an accident" (id. (purporting to quote Tr. 67)). Plaintiff faults the ALJ's inclusion in the RFC of "'access to indoor toilet facilities during routine employer-provided breaks[]'"(id. (quoting Tr. 20)) on two grounds: 1) "if [Plaintiff] only has access to a toilet when her employer allows it, during three scheduled breaks in the eight-hour workday, then this RFC finding in no way accounts for her urgency, incontinence,

23

and/or generally increased frequency of bowel movements" (id. (internal parenthetical citation omitted)), and 2) "'access to indoor toilet facilities' is a phrase which this Court and others have repeatedly deemed too vague to be of use when determining an individual's off task time incurred due to a bowel or urinary related medical condition[ and ] have held that ALJs must make specific findings regarding the frequency *and* duration of a claimant's need for bathroom breaks" (id. at 15; see also id. at 15-16 (citing Dowling v. Commissioner of Soc. Sec., 986 F.3d 377, 389 (4th Cir. 2021), Benfield v. Saul, 827 F. App'x 297, 301 (4th Cir. Sept. 24, 2020), Summey v. Berryhill, No. 1:16CV1185, 2018 WL 708355, at *3 (M.D.N.C. Feb. 5, 2018) (unpublished) (Peake, M.J.) (citing Binder v. Colvin, No. 5:12CV271, 2013 WL 1686306, at *3 (E.D.N.C. Mar. 21, 2013) (unpublished), recommendation adopted, 2013 WL 1694678 (E.D.N.C. Apr. 18, 2013) (unpublished)), recommendation adopted, slip op. (M.D.N.C. Feb. 22, 2018) (Biggs, J.), Taylor v. Astrue, No. 7:11CV162, 2012 WL 3637254, at *11 (E.D.N.C. Apr. 18, 2013) (unpublished), and Davis v. Commissioner of Soc. Sec., No. 2:10CV30, 2011 WL 442118, at *1 (N.D.W. Va. Feb. 2, 2011) (unpublished))). Plaintiff additionally points out that "[t]he VE testified that if [Plaintiff] had to use the restroom at any time other than the scheduled breaks, then she would not be employable in an unskilled work setting." (Id. at 14 (citing Tr.

24

84-85).)  As the following analysis makes clear, Plaintiff's contentions miss the mark for two reasons.

First, the ALJ <u>did</u> include a finding regarding the frequency and duration of Plaintiff's need for restroom breaks  - the ALJ found that Plaintiff's bowel symptoms required her to have "access to indoor toilet facilities <u>during routine employer-provided breaks</u>" (Tr. 20 (emphasis added).  The VE testified that employers provide <u>three breaks</u> during an eight-hour workday - a "morning, afternoon, and a lunch break" (Tr. 85).  <u>See</u> Social Security Ruling 96-9p, <u>Policy Interpretation Ruling Titles II and XVI: Determining Capacity to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work</u>, 1996 WL 374185, at *6 (July 2, 1996) ("SSR 96-9p") (characterizing eight-hour workday as having "a morning break, a lunch period, and an afternoon break <u>at approximately 2-hour intervals</u>" (emphasis added)).  Thus, the ALJ found in the RFC that Plaintiff "c[ould] use the bathroom during any of these breaks, as well as before and after work, without being off-task during working hours," <u>Rhonda E. G. v. Saul</u>, No. 8:20CV1423, 2021 WL 2262552, at *7 (C.D. Cal. June 3, 2021) (unpublished); <u>see also</u> <u>Mooney v. Kijakazi</u>, No. 2:22CV35, 2023 WL 6319329, at *3 (S.D. Miss. July 31, 2023) (unpublished) ("[I]t was not unreasonable for the ALJ to conclude that . . . [the plaintiff's] bathroom needs could be accommodated by the <u>customary work breaks</u>." (emphasis added)); <u>Jude v. Kijakazi</u>, No. 1:21CV10,

25

2021 WL 9569875, at *8 (S.D.W. Va. Nov. 17, 2021) (unpublished) (finding no error in "ALJ['s] conclu[sion] that [the c]laimant could change her pads and address hygiene concerns outside of work hours and <u>during normal breaks and meals during the workday</u>" (emphasis added)), <u>recommendation adopted</u>, 2022 WL 4594501 (S.D.W. Va. Sept. 30, 2022) (unpublished); <u>Silvestro v. Berryhill</u>, No. 4:16CV1150, 2017 WL 3840268, at *4, 6 (N.D. Ala. Sept. 1, 2017) (unpublished) (holding that ALJ properly analyzed "frequency of [the plaintiff's] bathroom visits" by "includ[ing] a limitation in the RFC to jobs that provided reasonable access to bathroom facilities <u>at usual and customary breaks</u> in order to accommodate [the p]laintiff's gastrointestinal symptoms" (emphasis added)); <u>Fivecoat v. Colvin</u>, No. 8:15CV703, 2016 WL 3660489 (M.D. Fla. June 15, 2016) (unpublished) (rejecting the plaintiff's argument that "ALJ failed to incorporate limitations related to [Plaintiff's] . . . neurogenic bladder[,]" where ALJ found that "[the plaintiff's] bladder issues c[ould] be accommodated within <u>customary regularly scheduled breaks and customary tolerance for restroom breaks in the workplace</u>" (emphasis added) (internal quotation marks omitted)), <u>recommendation adopted</u>, 2016 WL 3595800 (M.D. Fla. July 5, 2016) (unpublished).[11]

    In contrast, in the cases on which Plaintiff relies, the ALJ either failed to make <u>any</u> finding regarding the need for restroom

---

[11] The Westlaw publication of the <u>Fivecoat</u> case does not include star pagination and thus the undersigned could not include a pinpoint citation.

breaks, see Dowling, 986 F.3d at 389 ("[T]he ALJ failed to analyze whether [the plaintiff]'s RFC was impacted by her need to work near a restroom and take frequent bathroom breaks." (emphasis added)); Benfield, 827 F. App'x at 301 ("[T]he ALJ did not address the issue of frequent urination in the RFC or elsewhere in her opinion." (emphasis added)), or found that the plaintiff must have access to a restroom but failed to include a frequency and/or duration component, see Summey, 2018 WL 708355, at *3 ("[T]he ALJ . . . determined that [the plaintiff . . . must have access to bathroom facilities on an 'as needed' basis[,]" but "made no findings regarding the extent to which [the p]laintiff required unscheduled bathroom breaks, and there is thus no way to determine the extent to which the frequency and length of such breaks could potentially impact her ability to perform her job." (emphasis added)); Binder, 2013 WL 1686306, at *3 ("In assessing [the p]laintiff's RFC, the ALJ determined that [the p]laintiff required access to the bathroom/toilet facilities in the work environment[,]" but did not "make specific findings concerning the frequency and duration of [the p]laintiff's bathroom usage[,]" and thus "the [court] c[ould ]not determine whether the ALJ's findings . . . were supported by substantial evidence" (emphasis added) (internal citations and quotation marks omitted)); Taylor, 2012 WL 3637254, at *11 ("[T]he ALJ found [the plaintiff] capable of performing her past relevant work as a receptionist . . . based

upon the testimony of the [VE], who testified that a receptionist position would allow for . . . ready access to a bathroom <u>at will</u>. . . . [T]he ALJ nevertheless failed to address the VE's testimony that a person needing to take an excessive number of unscheduled bathroom breaks has the potential to be problematic. Given <u>the ALJ made no findings regarding to what extent [the plaintiff] required unscheduled bathroom breaks</u>, nor question[ed] the VE as to his definition of excessive, there is simply no way to conclude . . . that the ALJ's step-four finding is supported by substantial evidence." (emphasis added) (internal parenthetical citations, internal quotation marks, and brackets omitted)); <u>Davis</u>, 2011 WL 442118, at *1 ("[T]he ALJ [ ] include[d] in the plaintiff's [RFC] a required accommodation of placing the plaintiff <u>close to the bathroom</u>. . . . [The c]ourt finds that more specific findings regarding the frequency and duration of [the] plaintiff's need for the bathroom during the relevant time frame must necessarily also be included." (emphasis added)). Accordingly, those cases do not provide the Court with any basis to find prejudicial error in this case.

Second, Plaintiff has not cited to record evidence that would have <u>compelled</u> the ALJ to adopt a greater frequency and/or duration of restroom breaks in the RFC. Although Plaintiff points to her <u>subjective</u> statements that, "when not experiencing an obstruction, [her] medications cause her to use the restroom frequently for

28

bowel movements, <u>at least five times per day</u>" (Docket Entry 10 at 14 (emphasis added) (citing Tr. 66)), "that she wears protective pads '24/7' because her bowel movements are urgent and sometimes, she does not get to the bathroom in time and has an accident" (<u>id.</u> (purporting to quote Tr. 67)), and that her "[i]ncontinence has increased" (<u>id.</u> at 16 (citing Tr. 310)), the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 22). Significantly, Plaintiff has not challenged the ALJ's assessment of her subjective symptom reports. (<u>See</u> Docket Entries 10, 12.)

The ALJ further supported his discounting of Plaintiff's subjective statements by noting that "exam findings, high functioning activities of daily living . . ., and [Plaintiff's] statements at medical visits regarding medication/treatment efficacy are inconsistent with [her] testimony and statements that she cannot work due to disabling [] recurrent [SBO] with chronic constipation." (Tr. 25.) Although Plaintiff points to her <u>subjective</u> statement to her gastroenterologist, Dr. Farra Wilson, on May 12, 2023 (four days before the ALJ's hearing), that Plaintiff "'ha[d] some urgency'" and "'w[ore] pads just in case'" (Docket Entry 10 at 16 (quoting Tr. 2026)), Plaintiff did not report having at least five bowel movements per day to Dr. Wilson

29

at _any_ treatment visits (and, in fact, often complained of constipation) (see Tr. 921-23 (4/27/21 reporting no bowel movements "for [three] days"), 991-92 (7/27/21 complaining of constipation and "bouts of days with only a small amount of stool"), 1075-77 (1/7/22 documenting "daily bowel movement on [medication] regimen"), 1246-48 (2/24/21 first visit with Dr. Wilson prior to prescription of Linzess stating that, "[a]t baseline, [Plaintiff] can go a week without a bowel movement," that "[s]he gets feeling full then goes a lot all at once," and that she "[f]eels good for a few days and then the cycle starts again"), 1552-54 (11/11/22 recounting "an urgent, what she feels is complete, bowel movement daily"), 1555-57 (8/3/22 describing one bowel movement in last three days)), and no other visits in the record reflected either complaints of five bowel movements per day or Plaintiff's use of protective pads (see Tr. 342-2024, 2030-66). Under such circumstances, Plaintiff has simply not shown that the record evidence compelled the ALJ to include work-preclusive restroom breaks in the RFC. See Mooney, 2023 WL 6319329, at *3 ("[The p]laintiff counters on appeal that the unpredictable and urgent nature of his condition . . . would not allow him to wait until scheduled work breaks, and that[,] despite his improvements, at his best point medically, he still needed the bathroom as much as 3 times per day. But here again, in his last visit of record, Plaintiff reported experiencing only 1 bowel movement [per day] and

30

never more than 3 (frequency) without the need for Imodium (urgency). Without any objective medical evidence that his condition worsened, or that he was precluded from going to the bathroom before or after work, these arguments do not persuade." (internal quotation marks omitted)); compare Summey, 2018 WL 708355, at *3 (finding ALJ's allowance of restroom use "as needed" did not suffice, where "[the plaintiff's] medical records reflect that even when her condition was stable, she still reported 5–6 bowel movements each morning" (emphasis added) (internal quotation marks omitted)).

In sum, Plaintiff's second and final assignment of error fails to establish a ground for remand.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED**, and that this action is **DISMISSED** with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 19, 2025